**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

| | |
|---|---|
| JAMES GHAISAR and KELARA GHAISAR, Personal Representatives and Co-Administrators of the Estate of BIJAN C. GHAISAR, Deceased | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA and JOHN DOES 1-10, | |
| Defendants. | |

**COMPLAINT**

James and Kelara Ghaisar (together, the "Ghaisar family" or "Plaintiffs"), by and through their attorneys, bring this Complaint against the United States of America ("United States") pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq*. and 28 U.S.C. § 1346(b)(1), and John Does 1-10 ("Park Police officers"), in their individual capacities, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the Fourth Amendment to the Constitution.

The Ghaisar family alleges as follows:

**INTRODUCTION**

1.      This wrongful death and civil rights case is about the egregious, senseless, and unlawful killing of a young man by two out-of-control law enforcement officers.

2.      On November 17, 2017, two United States Park Police officers repeatedly shot Bijan C. Ghaisar ("Bijan"), a twenty-five-year-old accountant from McLean, Virginia, through the

door of his vehicle as he sat, passive and unarmed, behind the wheel. Bijan had driven away from a fender bender that occurred on the southbound lane of the George Washington Memorial Parkway, in which *his* vehicle was the one struck, and where there was negligible property damage and no known injuries.

3.     Following that minor traffic accident a Park Police cruiser with two officers inside began pursuing Bijan. A Fairfax County, Virginia police officer joined the pursuit and turned on his dashboard video camera.

4.     The footage from that camera, released in January 2018 by Fairfax County Police Chief Edwin C. Roessler ("Chief Roessler"), shows that Bijan drove at a reasonable rate of speed while being followed. He did not swerve or put anyone in danger and, despite his obvious duress, even continued to use his indicator when turning or switching lanes.

5.     Bijan stopped on three different occasions while being followed. Each time, the Park Police officers leaped from their patrol car, raced to Bijan's Jeep, and pointed a gun at his head through the driver side window.

6.     The first two times—presumably terrified of the overly aggressive officers—Bijan carefully and slowly drove away from their brandished weapons.

7.     At the third and final stop, Bijan came to a complete stop at a stop sign in the Fort Hunt area of Fairfax County, Virginia. The Park Police officers then blocked Bijan's Jeep with their patrol car, and again jumped out of it to confront him with guns drawn.

8.     The officers fired nine times into the Jeep, most from close range, as Bijan sat behind the wheel, unarmed.

9.     The officers' bullets struck Bijan four times in the left side of his head and once in his right wrist.

2

10.    At no time did Bijan pose a threat to anyone.  The officers, however, violated the Constitution and Park Police policy and training both in pursuing Bijan and in using force against him.

11.    At the hospital, Bijan remained in a coma until his death.  Park Police officers maintained that he was "under arrest," and forbade the Ghaisar family from touching or comforting Bijan, and severely restricted the family from even seeing him.

12.    After multiple doctors told the family that Bijan would never regain consciousness and would slowly die of organ failure, the family made the heart-wrenching decision to remove all life sustaining equipment.

13.    Bijan persevered—notwithstanding his horrific injuries—for ten days after the two officers shot him.

14.    On November 27, 2017, Bijan Ghaisar died at Inova Fairfax Hospital at 3300 Gallows Road, Falls Church, VA 22042, the same hospital where he was born.

15.    The Justice Department's Civil Rights Division, the U.S. Attorney's Office in Washington, D.C., and the Federal Bureau of Investigation ("FBI") are conducting a criminal investigation of Bijan's killing.

16.    For unknown reasons, the U.S. Attorney's Office for the Eastern District of Virginia has recused itself from the criminal investigation into this matter, and yet it is leading the civil defense.

17.    The Park Police have indicated that they will not begin an internal affairs investigation into the shooting until the Justice Department determines whether to file criminal charges.

18.     Today marks 333 days since Park Police officers shot Bijan, a bright, positive, and passionate young man who believed in candor, in justice, and in peace.

19.     Other than the video of the incident, which Chief Roessler released over Justice Department objections, virtually no information has been released to Bijan's family about the shooting.

20.     After almost eleven months, no federal, state or local government official has explained to Bijan's family why the Park Police frantically pursued Bijan down the George Washington Memorial Parkway and into Fairfax, VA after he drove away from a minor rear-end accident—again, involving no known injuries and little property damage—in which *he* was the victim.

21.     After almost eleven months, no federal, state or local government official has identified the officers involved in the shooting, even though virtually every law enforcement agency now does so shortly after a shooting.

22.     After almost eleven months, no federal, state or local government official has ever explained to the family why Bijan was "under arrest" and could not be touched in the hospital.

23.     Most importantly, after almost eleven months, no federal, state or local government official has ever explained to the Ghaisar family the reasons Park Police officers fired nine times into Bijan's Jeep as he sat behind the wheel, unarmed, in the early evening of November 17, 2017.

24.     This is because there is no reasonable explanation.

25.     Almost eleven months is too long for any grieving family to live without any explanation about why law enforcement officers shot and killed their son while authorities sit on relevant information.

26.     Everything about this case, from the chase, to the shooting, to the subsequent treatment of the family, has been cruel.

27.     The Ghaisar family brings this action, in their official capacity as co-administrators and personal representatives of the Estate of Bijan Ghaisar, to vindicate Bijan's statutory and constitutional rights to be free from arbitrary and deadly force.  They seek a declaration that the government violated his rights.  They also seek an appropriate amount of monetary damages for their harrowing and wholly unnecessary grief.  The Defendants are the United States and various federal officers.

## JURISDICTION AND VENUE

28.     This action is brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the Fourth Amendment to the Constitution and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq*. and 28 U.S.C. § 1346(b)(1), and Va. Code Ann. § 8.01-50 *et seq*.

29.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

30.     This Court also has exclusive jurisdiction over the FTCA claims in this action pursuant to 28 U.S.C. § 1346(b) because Plaintiffs allege tort claims against the United States for the acts of its employees.  The precise claims at issue are "claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

31.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1402(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

32.     On January 24, 2018, pursuant to 28 U.S.C. § 2675(a), Plaintiffs presented written notice, specifically a completed Standard Form 95 together with an addendum and all pertinent supportive documents, of their administrative tort claim to the appropriate federal agencies, the Department of the Interior ("DOI"), and the United States Park Police, through Plaintiffs' legal representative. *See* Attached Exhibit A.

33.     On January 25, 2018, a Claims Specialist provided written notice confirming DOI received Plaintiffs' notice. *See* Attached Exhibit B.

34.     By July 24, 2018—six months after Plaintiffs submitted their claim—the Department of Interior had neither accepted nor rejected such claim and, pursuant to 28 U.S.C. § 2675(a), Plaintiffs elect to consider such failure to act as a final denial of the claim.  The Ghaisar family has thus exhausted their administrative remedies for purposes of their claims under the FTCA.  *See* 28 U.S.C. §§ 2675, 1346.

35.     Consistent with 28 U.S.C. § 2401(b), Plaintiffs are commencing this action within six months of the government's denial of their claims.

## APPLICABLE SUBSTANTIVE LAW

36.     The substantive law of the State of Virginia governs the Ghaisar family's FTCA claims under 28 U.S.C. § 1346(b)(1) because the Park Police officers' unlawful conduct occurred in Virginia.

**JURY DEMAND**

37.     Plaintiffs demand a trial by jury in this action for each of their claims triable to a jury.

**PARTIES**

38.     At all times material to the events set forth in this Complaint, Plaintiff JAMES GHAISAR has been a resident of the Eastern District of Virginia.  He is a United States citizen currently residing in McLean, Virginia, 22102.

39.     Plaintiff James Ghaisar is Bijan's father, and is a personal representative and co-administrator of the Estate of Bijan Ghaisar.  *See* Attached Exhibit C.

40.     At all times material to the events set forth in this Complaint, Plaintiff KELARA "KELLY" GHAISAR has been a resident of the Eastern District of Virginia.  She is a United States citizen currently residing in McLean, Virginia, 22102.

41.     Plaintiff Kelly Ghaisar is Bijan's mother and is a personal representative and co-administrator of the Estate of Bijan Ghaisar. *See* Attached Exhibit C.

42.     The deceased, Bijan, is not survived by a spouse or children.

43.     According to Bijan's death certificate, he died on November 27, 2017.  The coroner listed the manner of death as "homicide."

44.     Defendant UNITED STATES is sued under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq*. and 28 U.S.C. § 1346, for the tortious acts of its employees.

45.     Because Defendant UNITED STATES refuses to identify the Park Police officers involved, Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant DOES 1 through 10 ("DOE Defendants"), inclusive, and therefore sues those Defendants by fictitious names.

7

46.     DOE Defendants 1 and 2 are the U.S. Park Police officers who chased and shot Bijan on November 17, 2017.  DOE Defendants 1 and 2 are sued in their individual capacities.

47.     DOE Defendants 3 through 10 include, but are not limited to, the following U.S. Government officers and officials: those involved in the radio traffic communication leading to and during Park Police's pursuit of Bijan's Jeep; those who racially and religiously profiled Bijan and Plaintiffs at Inova hospital, where Bijan died of his gunshot wounds; those who mistreated and harassed the Ghaisar family at Inova hospital; *and* those who continue to remain silent about this illegal shooting, withholding the names of the officers who shot Bijan and the reasons why they did so.  DOE Defendants 3 through 10 are sued in their individual capacities.

48.     Plaintiffs are informed and believe, and on that basis allege, that these DOE Defendants are in some manner responsible and liable for the acts and damages alleged in this Complaint, and that among these DOE Defendants are supervisory employees and federal agents who acted under color of law.  Plaintiffs will amend their Complaint to allege the DOE Defendants' true names and capacities when Defendants cease withholding them, as they ultimately must.

## FACTS

### A.  Bijan C. Ghaisar was a fun-loving, gun-hating, sports-crazy young man

49.     At the time he was shot and killed by the Park Police, Bijan was twenty-five years old.  He was two years out of college, worked as an accountant, and lived in an apartment in McLean, Virginia near his parents' home.

50.     Bijan's parents, James and Kelly Ghaisar, both grew up in Iran and immigrated to the United States in the 1970s.  Both became citizens of the United States.

51.     Kelly's father was the police chief in Shiraz, Iran, and a colonel in Tehran.  For this reason, Bijan grew up with deep respect for law enforcement.

52.     James and Kelly were married in 1986.  Their daughter, Negeen Ghaisar was born in 1988, and Bijan was born in 1992.  After living in Vienna, Virginia, for several years, the family moved to McLean, where James operated his own accounting practice.  Kelly worked as a makeup artist and an interior designer, and also sold real estate.

53.     Bijan was a young man of many passions, including chicken wings and video games.  Like many Americans, he also loved professional football.  Bijan was nine years old at the time of the 9/11 terrorist attacks.  After watching the New England Patriots win the Super Bowl that season, Bijan told his family that the Patriots were his favorite team for inspiring hope again in America.  Bijan named his dog Bruschi, after Patriots' linebacker Tedy Bruschi.

54.     At Langley High School, Bijan played both football and lacrosse.  Although he was not particularly big or athletic, he worked very hard for playing time.  He graduated from high school in 2010.

55.     For college, Bijan and several friends chose the University of Alabama, not far from where Bijan's father had earned his MBA with a specialization in accounting at the University of South Alabama.  But Bijan found it to be too far from home and family.  After a devastating hurricane in Alabama his freshman year, Bijan made the decision to transfer back closer to home, to Virginia Commonwealth University ("VCU").

56.     Bijan was beloved by his friends.  Classmates and fraternity brothers from VCU describe him as a goofy and jovial friend; a real pleasure to be around.  Childhood friends remember him as fun loving, comforting, and considerate.

57.     Bijan graduated from VCU with an accounting degree in 2015 and began working for his father's accounting practice.  He lived in an apartment in a Fairfax County high-rise.

58.     Professionally, Bijan aspired to do something to make this world better.  He often expressed this hope to his family.

59.     Bijan hated very few things, but one thing he hated was guns.  He advocated for peace and nonviolence.  After the mass shooting at a movie theatre in Aurora, Colorado, in 2012, Bijan took to Facebook to say it was upsetting and unacceptable that America had not embraced gun control.

60.     On the day he was shot and killed, Bijan ate lunch at his parents' house, and then took a walk with his mother.  This was the last time Kelly saw Bijan.

61.     That evening, Bijan had plans to have dinner with his father at 8 p.m.  But, Bijan never showed up.

**B.  An Uber driver rear-ends Bijan right before Park Police aggressively pursue him**

62.     In the early evening of November 17, 2017, Bijan was driving on the George Washington Memorial Parkway (the "Parkway").  His vehicle was a 2013 green Jeep Grand Cherokee ("Jeep") with a vanity license plate that read "BIJAN."

63.     Bijan stopped his Jeep and was struck from behind by an Uber driver in a red Toyota Corolla.

64.     According to the Department of the Interior Investigator's Traffic Crash Report, this minor traffic collision happened at about 7:31 p.m.  The rear-end collision happened on the southbound side of the Parkway just north of Alexandria, Virginia.

65.     According to this report, which is for unknown reasons dated December 1, 2017 (fourteen days after the crash date), Park Police Officer Anthony McSherry investigated the crash "at the scene," and determined the crash was not a "hit and run."  He also marked that it did not cause any "non-motor-vehicle property damage."

66.     Park Police Officer McSherry cited the Uber driver for the accident because he failed to maintain proper control, a standard charge for a rear-end collision.

67.     The Park Police's report also said the amount of damage to the Jeep was "unknown," even though Park Police could have easily determined this since police had towed the Jeep to their seizure lot long before the date that the report was issued. Authorities have refused to give the family any access to the Jeep or Bijan's personal belongings therein including his cellphone, wallet, clothing, or music.

68.     It appears from photos of Bijan's vehicle that his Jeep did not sustain any damage. There is no evidence that anyone was injured and, again, the Park Police report states that no one was.

69.     Bijan reportedly drove away from the scene without exchanging information with the Uber driver.

70.     The Uber driver (and perhaps also his passenger) dialed 911.

71.     Either the Uber driver or his passenger saw Bijan's license plate and reported "BIJAN" to the police. Though they were in Alexandria City, VA their call was routed to nearby Arlington, VA which most likely forwarded the call to Park Police.

**C.  Without putting anyone in danger, Bijan, who had no criminal record, was trying to get to safety and away from out-of-control officers who were chasing him**

72.     Several minutes after the traffic accident, a marked Park Police cruiser with two officers inside began following Bijan's Jeep heading south on the Parkway, which is maintained by the National Park Service.

73.     At approximately 7:37 p.m., a Fairfax County police officer joined the Park Police's pursuit. The video footage of the incident comes from the Fairfax officer's vehicle's dashboard video camera.

74.     The Park Police officers did not have vehicular or body-worn cameras.

75.     As a policy, Park Police do not use vehicular or body-worn cameras.

76.     The footage from the Fairfax camera shows Bijan stopped three times during the pursuit.

77.     Each time—including the very first time, with absolutely no apparent reason to be aggressive—the Park Police patrol car pulled close to the Jeep, and the Park Police officers leaped from their car and ran to the Jeep brandishing weapons.

78.     Each time, Park Police officers pointed a gun toward Bijan's head.

79.     Each time, at least one of the officers was close enough to touch the vehicle, but neither officer was ever in the Jeep's path or in harm's way.

80.     Most likely out of mortal fear of the overly aggressive officers with their guns drawn on him, Bijan slowly drove off the first and second times that the Park Police pulled him over.

81.     Park Police have jurisdiction over the Parkway.  Park Police policy on pursuing vehicles states that officers are authorized to pursue a vehicle only when the driver is suspected of a felony, or presents a clear and immediate threat to public safety, and also states that "[t]he act of fleeing and eluding the police shall not in itself be a pursuable offense." General Order on Vehicular Pursuits: Number 2205, 2205.01 (B) (June 8, 2018).

82.     During the pursuit, Bijan appeared to be driving at a reasonable rate of speed and he is not observed swerving, driving erratically, or otherwise placing anyone in danger.

83.     At the time he was repeatedly shot and killed by the Park Police, Bijan had no criminal record.

### a. *Bijan's First Stop*

84. Much of the Parkway where Bijan drove does not have a shoulder on the side of the road for cars to pull over.

85. At 7:38 p.m., Bijan stopped in the right-lane of the Parkway, when the marked Park Police patrol car pulled alongside the Jeep, and the Park Police officers leaped from their car and ran to the Jeep.

86. At least one officer approached Bijan's window with a gun pointed toward his head.

87. This same Park Police officer aggressively jerked Bijan's car door handle in an attempt to open his door.

88. Bijan slowly drove off.

89. This Park Police officer slammed his gun into Bijan's Jeep, seemingly in frustration, and dropped something to the ground.

90. The Fairfax officer pulled out to follow Bijan's Jeep, but the more aggressive Park Police car soon passed the Fairfax officer.

### b. *Bijan's Second Stop*

91. At 7:40 p.m., Bijan used his right-turn signal to pull off the Parkway at the West Boulevard Drive exit. Bijan again stopped in the road.

92. The Park Police officers parked their patrol unit slightly in front of Bijan's Jeep and ran to his window. Again, at least one officer had his gun drawn. And, again, Bijan drove off slowly and carefully around the Park Police car, while one of the officers kicked the side of Bijan's Jeep.

93. Bijan drove from West Boulevard Drive a short distance to Alexandria Avenue, then headed toward Fort Hunt Road with the Park Police and Fairfax patrol cars behind him.

13

### c. *Bijan's Third Stop*

94.     At 7:41 p.m., at the intersection of Fort Hunt Road and Alexandria Avenue, in a residential neighborhood in the Fort Hunt area of Virginia, Bijan stopped a third time.

95.     Bijan stopped at the stop sign, in his lane.

96.     The Park Police officers pulled their patrol car in front of Bijan's Jeep.

97.     As the Park Police officers rushed to Bijan's car, again with guns drawn, the Jeep appears to roll forward slightly and to the right, away from the officers on the left.

98.     The video does not show any officers in any danger of the Jeep striking them.

99.     Bijan's window remained closed.

100.     The Park Police officers were within close range of Bijan as he sat unarmed behind the wheel of his Jeep, when they fired nine shots into his vehicle.

101.     These shots were fired recklessly and put the Fairfax police officer, whose dashboard camera captured the shooting, in potential danger.

102.     Starting at 7:41:33 p.m., the officers first fired five shots at Bijan.  Then they paused.

103.     Then at 7:41:42 p.m., the officers fired two more shots.  Then they paused.

104.     The Jeep stopped moving entirely.

105.     The officers moved closer, and after twelve seconds, the Jeep again began rolling toward the ditch on the side of Alexandria Avenue, away from the officers.  There was no curb or sidewalk on the ditch side of the road.  It appeared as if Bijan's foot had slipped off the brake but was not on the gas pedal because the vehicle was rolling slowly toward the ditch.

106.     At 7:41:57 p.m., one of the officers, who had holstered his pistol, unholstered it.

107.     The officers fired two more shots at close range.

14

108.    There was no threat to either officer or anyone else at the time of these repeated volleys of shots.

109.    The Jeep continued slowly toward the ditch and pitched gently to its side, contacting the stop sign, where it again stopped.

**D.  The officers who fatally shot Bijan violated the United States Constitution and Park Police policies and training in pursuing him and using force against him**

110.    In general, the two Park Police officers repeatedly violated the United States Constitution as well as Park Police policies and training by their behavior following this minor traffic accident, including, but not limited to: chasing an individual; chasing a vehicle into another jurisdiction; parking their vehicle alongside a vehicle they had stopped; aggressively approaching a stopped vehicle at a run; unholstering their firearms; pointing their firearms at another person; using a firearm to strike a vehicle; kicking a vehicle; their initial use of deadly force; and their continued and repeated use of deadly force over an extended period of time with no provocation or response.

**a.  *General Order on Vehicular Pursuits: Number 2205 ("Order 2205")***

111.    Order 2205 states that "[a]s soon as practical, the pursuit shall be relinquished to police units of the entered jurisdiction." 2205.04 (B)(4).

112.    The Park Police officers chasing Bijan neither relinquished nor even attempted to relinquish their pursuit to Fairfax County officers, including the one driving right behind them, even though they had left the Parkway.

113.    According to the same order, Park Police officers must notify the Communications Section that they are pursuing someone and whether the "pursuit will be entering another jurisdiction." 2205.04 (A)(9)(e).

114.     There is nothing to suggest that the Park Police officers notified anyone that they were pursuing Bijan from the Parkway into Fairfax County's jurisdiction.

115.     Order 2205 also states that a Park Police officer is "normally authorized" to pursue a person into a different jurisdiction without a warrant only if the "suspect" has "committed a felony." 2205.03 (B).

116.     Here, the accident report prepared by a Park Police officer does not cite to any property damage or injury.  Again, Bijan's vehicle was the one struck in that fender bender, and it is very difficult to see how he could have committed any felony while being struck by another vehicle from behind.

117.     Consequently, Park Police officers were not authorized to chase him from the Parkway into a residential area of Fairfax County.

   **b.  *General Order on Use of Force: Number 3615 ("Order 3615")***

118.     Order 3615 (dated September 28, 1998) instructs Park Police officers to use "reasonable forms of verbal commands, including volume and tone control" to "avoid having to escalate to a higher level of force." 3615.03 (A).

119.     Here, Park Police officers did not use reasonable forms of verbal commands in approaching Bijan.  Rather, they immediately escalated to a higher level of force in opting to park alongside Bijan and unholster their guns that they aimed toward Bijan's head and/or used to bang on his window.

120.     This order also states that deadly force is permissible "only when necessary, that is when the officer has a reasonable belief, in light of the facts and circumstances confronting the officer, that the subject of such force poses an *imminent danger of death or serious bodily harm to the officer or to another person*." 3615.03 (C)(1) (emphasis added).

121.    There is no basis to believe that the officers reasonably perceived any imminent danger "of death or serious bodily harm" to themselves or another person.  In fact, by approaching Bijan as aggressively and recklessly as they did in this situation, they made clear that they did not perceive any danger of death or bodily harm.  Thus, the officers' decision to aggressively pursue Bijan and use excessive force to seize him is unjustified and, more importantly, unlawful.

122.    Order 3615 clarifies that "[o]fficers shall not fire at a moving vehicle . . . except when the officer has a reasonable belief that the subject poses an *imminent danger of death or serious physical injury to the officer or to another person*." 3615.03 (C)(3)(a) (emphasis added).

123.    To the extent that Bijan's vehicle was moving at any time when the Park Police officers shot at Bijan, their actions violated Order 3615.

124.    Park Police officers jeopardized Bijan's safety and the public's safety when they fired nine shots into his car at an intersection of a residential neighborhood.

**E.   At some point after Park Police officers shot Bijan four times in the head at close range, they placed him "under arrest" for no known reason**

125.    According to Fairfax fire and rescue records, an ambulance from Alexandria arrived twelve minutes after the shooting.  The ambulance transported Bijan to Inova Fairfax Hospital ("Inova"), the same hospital where he was born.

126.    Any unnecessary delay in providing Bijan with medical assistance after he was shot constitutes a deprivation of rights in violation of the Constitution.

   **a.   *Park Police detectives waited five hours before notifying the Ghaisar family that Bijan had been critically wounded***

127.    Though Bijan had identification on his person and inside his car, Park Police officers waited about five hours before notifying James and Kelly Ghaisar about the shooting.

128.    James Ghaisar, who had been expecting to meet Bijan for dinner, had repeatedly tried to reach Bijan by cell phone and was waiting to hear back from him.

129.    Park Police detectives did not knock on the door of James and Kelly's home until around 1:00 a.m.

130.    The two detectives who came to the Ghaisars' home showed James and Kelly a picture of the tattoo Bijan had on his torso, lines of Farsi (Persian) script.  The tattoo was a spiritual love poem by Rumi, a 13th-century poet and scholar.  Farsi script resembles Arabic script.

131.    The Park Police detectives told Bijan's parents that Bijan had been transported to Inova Hospital because he had been involved in a "shootout."

132.    The detectives promised the Ghaisar family that they would meet them at the hospital to explain how their son was injured.  These detectives never met the family at the hospital and never provided an explanation.  The family still has received no explanation from any official.

133.    Bijan's parents had to call their daughter Negeen Ghaisar, who was in Pittsburgh, Pennsylvania, to tell her that her only sibling, Bijan, was in the hospital in critical condition.  Negeen Ghaisar and her husband, Kouros Emami, immediately got on a flight to Ronald Reagan Washington National Airport.

### b.  *Park Police obstructed the Ghaisar family's ability to make informed medical decisions for Bijan and caused them severe emotional distress*

134.    When James and Kelly Ghaisar arrived at the hospital, they were told that they were not allowed to see their son and were not given any information about how he was hurt.

135.    Park Police never told the Ghaisar family that two of its officers had shot Bijan.  The Ghaisar family learned this fact—about twelve hours after the shooting—when they saw a local news story on a hospital waiting area television.

136.    Throughout the experience, Park Police officers alternatively referred to Bijan as a "perp" or "evidence" and told the Ghaisar family that he was "under arrest."  Bijan was in a coma.

137.    The Ghaisar family, confused and distraught by these justifications, repeatedly asked the Park Police to explain why they had arrested Bijan.  They also asked Park Police to provide them with a charging document.  The Park Police refused to answer these questions.

138.    Hospital staff informed the Ghaisar family that Bijan was inoperable.

139.    Desperate to learn more about Bijan's condition and manage his medical care, Bijan's parents called a close family friend, an affiliate care provider at Inova.  They reasoned that Park Police would allow a physician who regularly treats patients at Inova to enter Bijan's room.

140.    This doctor attempted to see Bijan.  Park Police stopped the doctor from entering, forcing him to leave the ICU.  This doctor explained to the family that in all his years of practice no one had firmly prevented him from attending to a patient.

141.    The Park Police deprived the Ghaisar family of their right to make informed medical decisions for Bijan.

142.    By prohibiting organ donation officials from seeing Bijan or discussing the matter with the Ghaisar family because Bijan was "evidence," the Park Police also interfered with Bijan's decision to donate his organs.

143.    Additionally, having law enforcement treat their son as a criminal without explanation or justification was cruel, incredibly distressing, and unimaginably painful to the Ghaisar family.

      c.   ***Park Police continued to guard Bijan's room twenty-four hours a day and severely limit the Ghaisar family's access to him***

144.    The Ghaisar family continued to beg the officers for permission to see Bijan.

145.     The Park Police instructed the Ghaisar family that they could only enter Bijan's room two at a time, only at the top of the hour, and limited to ten minutes.  James, Kelly, and Negeen Ghaisar were told that if they came to the room at one minute past the hour, they would only have nine minutes to spend with their son and brother.

146.     This policy became even more absurd after Kouros Emami—Bijan's brother-in-law and a psychologist—took one of the shifts to see Bijan.  Kouros is tall, has an athletic build, and carries a thick, black beard.  After Kouros saw Bijan, the Park Police modified their own policy and said that only one person, guarded by two Park Police officers, could enter at a time.  Park Police claimed this was necessary in case they needed to restrain one of the family members.

147.     The hospital staff interceded on behalf of the family to help convince the Park Police to reverse this one-visitor-at-a-time policy.

148.     While the Park Police guarded Bijan's room for approximately three days, the Ghaisar family set alarms on their cell phones to avoid missing their ten-minute window to see Bijan.  They would nap on the hospital floor in between shifts.

149.     Once inside Bijan's room, the family's movements were closely monitored by the Park Police.  One officer explained that this was because Bijan's body was "evidence."

150.     At one point, the Ghaisar family authorized a Chaplain to pray with Bijan.  The Park Police officers guarding Bijan told the Chaplain that she could not touch Bijan because he was Muslim and Muslims could not be touched by women.

151.     Bijan was not Muslim.

152.     After three days, the FBI took over from the Park Police.  The FBI relaxed many of the restrictions on the Ghaisar family's ability to spend time with their dying son.

153.     When Park Police Chief Robert MacLean finally visited the Ghaisar family in the hospital after the shooting, the Ghaisar family called their attorney to join them for the conversation.   Chief MacLean refused to allow the family to record the conversation.   Chief MacLean told the family that while he was sorry for their loss he was unable to tell them anything. He went on to say that even if he could tell them something, he would not do so in the presence of their attorney.

### d. Bijan dies on November 27, 2017

154.     A number of doctors told the family that Bijan would not survive and that he was slowly dying of organ failure.   Based on the information provided by the doctors, the family had the hospital remove the feeding and breathing tubes from Bijan after he had survived in a coma for nine days.

155.     Bijan survived over ten hours without the respirator.

156.     Bijan was pronounced dead on November 27, 2017.

157.     The Ghaisar family suffered and continues to suffer emotional distress because the Park Police denied them opportunities to comfort and spend time with Bijan in his final days.

158.     Having the Park Police prevent them from comforting Bijan continues to haunt the family as they wonder how much pain and suffering Bijan experienced from his wounds.   The shots Park Police fired at Bijan shattered his teeth and his left eye.   His mother remembers that one of his ears was hanging off and a gap under the bridge of his nose.   And Bijan's sister Negeen recalls sitting near her brother and observing his face swell to such a large size that she wondered if it would burst.   For days, the Ghaisar family had to observe Bijan without the ability to reach out and comfort him.

159.    The Ghaisar family continues to suffer from severe emotional distress because the Park Police, the very agency responsible for unlawfully shooting Bijan, also closed him off from the love, care, and comfort of his family and friends as, day after day, Bijan lay dying.

**F.  Despite pleading with the authorities for information to deal with the pain of losing their child and brother, the authorities remain silent on all aspects of Bijan's killing**

160.    Almost eleven months after the Park Police killed Bijan, none of the agencies, including the FBI, the Department of Justice Civil Rights Division, or the D.C. U.S. Attorney's Office has substantively commented on the case.  They have refused to provide, and have stood in the way of others providing, the Ghaisar family with significant information in their possession about the shooting.  For example, the Ghaisar family has not been told what, if anything, was found inside Bijan's Jeep, why he was pursued, or why he was placed "under arrest" at the hospital.

161.    U.S. Government officials continue to stand in the way of federal and state Freedom of Information processes by preventing the Ghaisar family and members of media from receiving information about the shooting.

162.    Park Police have said that Bijan's Jeep was involved in an accident, but law enforcement refuses to release any information about the accident.

163.    Even now, almost eleven months after Bijan's shooting, none of the agencies have offered even a bare-bones account to explain why Park Police officers repeatedly opened fire on Bijan, who—as a video of the incident shows—presented no threat to himself, the officers, or anyone else.

164.    In fact, the Ghaisar family was only able to view the video documenting their son's killing because Fairfax County Police Chief Roessler decided to release it against the wishes of the Department of Justice.

165.    As "the administrative custodian of the video," Chief Roessler explained he was "releasing the in-car video of the U.S. Park Police shooting" "[a]s a matter of transparency to all in our community, especially the Ghaisar family." FCPD Media Relations Bureau, *Chief Roessler Releases Video of November U.S. Park Police Shooting in Fairfax County*, Fairfax County Police Department News (Jan. 24, 2018), https://fcpdnews.wordpress.com/2018/01/24/chief-roessler-releases-video-of-november-u-s-park-police-shooting-in-fairfax-county/.

166.    As a result of Bijan's injuries, arrest, and death, James, Kelly, and Negeen Ghaisar experienced and continue to experience severe and lasting emotional and mental distress including but not limited to anxiety, depression, fear, nervousness, and despair as a direct result of the violations complained of herein.

## FIRST CLAIM FOR RELIEF
### Negligence (Wrongful Death Action)

167.    The foregoing allegations are re-alleged and incorporated herein by reference.

168.    In pursuing, threatening, shooting, and ultimately killing Bijan, Park Police officers acted negligently, carelessly, recklessly, and unlawfully, breaching a duty to act as reasonable officers would under the circumstances.

169.    Police officers, including Park Police, have a duty to use reasonable care to prevent harm or injury to others.  This duty includes using appropriate tactics, giving appropriate commands, giving warnings, not using any force unless necessary, using less-than-lethal options, and only using deadly force as a last resort.

170.    Park Police officers breached this duty because *inter alia*, they

(a)    failed to act in a manner consistent with their law-enforcement training;

(b)    failed to communicate reasonably with Bijan during the pursuit;

23

(c)    failed to use the amount of force that would be deemed necessary by a reasonable officer in a similar situation; and

(d)    failed to follow their own procedural mandates.

171.    As a result of the unlawful conduct of the Park Police alleged above, and other undiscovered negligent conduct as to which the Ghaisar family cannot know the details in the absence of any disclosure by law enforcement of the facts surrounding the incident, Bijan sustained fatal injuries that resulted in his death.

172.    As a further result of the unlawful conduct of the Park Police, the Ghaisar family witnessed their only son struggling for life while in a coma, and thereby suffered extreme emotional distress, including grief, anxiety, worry, shock, apprehension, terror, and mental anguish.

173.    As a further result of the unlawful conduct of Park Police officers, James, Kelly, and Negeen Ghaisar suffered and continue to suffer loss of love, society, solace, companionship, comfort, care, assistance, protection, affection, and support by Bijan, and will continue to be so deprived for the remainder of their natural lives.

174.    This count is against the United States.

### SECOND CLAIM FOR RELIEF
### Assault and Battery (Wrongful Death Action)

175.    The foregoing allegations are re-alleged and incorporated herein by reference.

176.    Park Police officers, while working as officers for the United States, and acting within the course and scope of their duties, threatened to apply unlawful and unnecessary force against Bijan when they pursued Bijan.

177.     Park Police officers, while working as officers for the United States, and acting within the course and scope of their duties, caused bodily harm to Bijan by shooting him multiple times, including in the head, and killing Bijan, while he was sitting in his car.

178.     Park Police officers used unreasonable and excessive force when they shot Bijan without Bijan's consent and against his will.

179.     Park Police had no legal justification for threatening to use force or using force against Bijan, and their use of force while carrying out their duties as police officers was an unreasonable and unprivileged use of force.

180.     As a result of the unlawful conduct of the Park Police, Bijan suffered severe pain and suffering from his injuries.

181.     As a further result of the unlawful conduct of the Park Police, Bijan died.

182.     This count is against the United States.

### THIRD CLAIM FOR RELIEF
### <u>False Arrest and Imprisonment (Wrongful Death Action)</u>

183.     The foregoing allegations are re-alleged and incorporated herein by reference.

184.     Park Police officers violated Bijan's legal rights to be free from unlawful arrest and imprisonment when they intentionally deprived Bijan of his freedom of movement by use of force, threats of force, menace, and unreasonable duress.

185.     Park Police officers detained Bijan without reasonable suspicion and arrested him without probable cause.

186.     Bijan did not knowingly or voluntarily consent.

187.     Park Police detained Bijan for an appreciable amount of time.

188.    As a result of the unlawful conduct of the Park Police, the United States is liable for the Ghaisar family's injuries, either because its employees were integral participants in wrongful detention and arrest, or because they failed to intervene to prevent these violations.

189.    This count is against the United States.

**FOURTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress**

190.    The foregoing allegations are re-alleged and incorporated herein by reference.

191.    The Ghaisar family further alleges that the conduct of Park Police officers, including fatally shooting their son, was outrageous and intolerable.

192.    Park Police officers undertook these actions with intentional and reckless disregard of the substantial likelihood of causing severe emotional distress to the Ghaisar family.

193.    As a result of the unlawful conduct of the Park Police, James, Kelly, and Negeen Ghaisar suffered and continue to endure severe and emotional distress, resulting in acute depression and damage to their well-being that persist to this day.  The Ghaisar family has suffered severe emotional pain and suffering.

194.    This count is against the United States.

**FIFTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**

195.    The foregoing allegations are re-alleged and incorporated herein by reference.

196.    The Ghaisar family further alleges that Park Police acted negligently and carelessly by, *inter alia*, fatally shooting their son.

197.    Park Police officers undertook these actions with reckless and negligent disregard of the substantial likelihood of causing severe emotional distress to the Ghaisar family.

198.    As result of the unlawful conduct of the Park Police, the Ghaisar family suffered and continues to endure severe and emotional distress, resulting in acute depression and damage to their well-being that persist to this day.  The Ghaisar family has suffered severe emotional pain and suffering.

199.    The Ghaisar family's injuries are the natural result of the fright and shock proximately caused by Defendants' negligence.

200.    This count is against the United States.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Fourth Amendment: Unlawful Seizure by Using Unreasonable and Excessive Deadly Force**

201.    The foregoing allegations are re-alleged and incorporated herein by reference.

202.    Defendants John Does 1-10 have intentionally or recklessly violated Bijan's rights, privileges, and immunities secured to him by the Fourth Amendment to the United States Constitution including the right to be free from unreasonable searches and seizures without probable cause and the right to be free of and from the use of excessive force.

203.    The Ghaisar family alleges, *inter alia*, that firing multiple gunshots at an unarmed driver who was—at most—failing to comply with a police officer's commands amounts to the use of excessive and unreasonable deadly force against the unarmed driver in violation of the Fourth Amendment to the United States Constitution.

204.    Pursuing, shooting, arresting, and killing Bijan violated the Fourth Amendment to the United States Constitution because, *inter alia:*

(a)    he was pursued aggressively and unreasonably by Park Police officers;

(b)    because there was no reasonable suspicion to justify a seizure;

(c)   because in continuing to pursue Bijan in a manner contrary to the Park Police's own mandates, Bijan was deprived of his right to be free from unreasonable, excessive, and deadly force;

(d)   because in continuously approaching Bijan with guns pointed at his head whenever he pulled over, Park Police officers deprived Bijan of his right to be free from unreasonable, excessive, and deadly force;

(e)   because Park Police gratuitously fired shots at Bijan as a means to seize him, knowing they were likely to cause severe injury or death to the unarmed driver;

(f)   because Park Police gratuitously fired shots at Bijan who, despite fleeing, did not pose a threat to them;

(g)   because Park Police gratuitously fired shots at Bijan well after Bijan was too severely injured to be a threat; and

(h)   because there was no probable cause to justify arresting and detaining Bijan and depriving him of his family's care and presence before he died.

205.   As a result of Defendants John Does' 1-10 unlawful conduct, Bijan suffered fatal injuries and monetary damages.

206.   This count is against the Defendants John Does 1-10.

## DAMAGES

207.    As a result of Defendants' unlawful conduct, Bijan's death on November 27, 2017, irreparably injured the Ghaisar family.

208.    As the surviving parents of Bijan and as personal representatives and co-administrators of the Estate of Bijan Ghaisar, the Ghaisar family seeks damages to compensate for, *inter alia*:

    (a)    Their sorrow and mental anguish;

    (b)    Loss of Bijan's care, comfort, guidance, companionship, society, advice, and kindly offices;

    (c)    Medical and hospital expenses related to Bijan's final injuries and death;

    (d)    Reasonable funeral and burial expenses; and

    (e)    Punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons stated above, the Ghaisar family respectfully requests that the Court enter a judgment against Defendants:

1.    Awarding compensatory damages to Plaintiffs in the amount of $25,000,000;

2.    Awarding compensatory and punitive damages against the individual DOE Defendants for the constitutional violations their son suffered in an amount to be shown at trial;

3.    Awarding damages recoverable under Va. Code Ann. § 8.01-50;

4.    Awarding Plaintiffs attorneys' fees and costs pursuant to federal and state laws, including 28 U.S.C. § 2412; *and*

5.    Ordering such other and further relief as the Court considers just and proper.

Dated: October 16, 2018

Respectfully submitted,

/s/ Thomas G. Connolly
Thomas G. Connolly (VA Bar No. 29164)
Roy L. Austin, Jr. (*for pro hac admission*)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*tconnolly@hwglaw.com*
*raustin@hwglaw.com*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2018, I served a copy of the foregoing and accompanying materials on the Attorney General of the United States and United States Attorney's Office for the Eastern District of Virginia by hand and U.S. Certified Mail.

/s/ Thomas G. Connolly
Thomas G. Connolly (VA Bar No. 29164)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*tconnolly@hwglaw.com*

*Counsel for Plaintiffs*
