| | |
|---|---|
| JAMES GHAISAR and KELARA GHAISAR, Individually and as Personal Representatives and Co-Administrators of the Estate of BIJAN C. GHAISAR, Deceased<br><br>     Plaintiffs,<br><br>v.<br><br>Alejandro Amaya, Lucas Vinyard, and JOHN DOES 3-10<br><br>     Defendants. | Civil Action No. 1:18-cv-1296 (CMH/IDD) |

## AMENDED COMPLAINT

James and Kelara Ghaisar (together, the "Ghaisar family" or "Plaintiffs"), by and through their attorneys, bring this Amended Complaint in their official and individual capacities, against Alejandro Amaya, Lucas Vinyard, and JOHN DOES 3-10, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the United States Constitution, including the Fourth Amendment to the Constitution.

The Ghaisar family alleges as follows:

### INTRODUCTION

1.      This civil rights case is about the egregious, senseless, and unlawful killing of a young man by two out-of-control law enforcement officers, and subsequent racial and religious profiling by law enforcement officers.

2.      On November 17, 2017, two United States Park Police officers— Alejandro Amaya ("Amaya") and Lucas Vinyard ("Vinyard")—repeatedly shot Bijan C. Ghaisar ("Bijan"), a twenty-

five-year-old accountant from McLean, Virginia, through the door of his vehicle as he sat, passive and unarmed, behind the wheel.

3.     Bijan had driven away from a fender bender that occurred on the southbound lane of the George Washington Memorial Parkway, in which *his* vehicle was the one struck, and where there was negligible property damage and no known injuries.

4.     Following that minor traffic accident, a Park Police cruiser with two officers inside—Amaya and Vinyard—began pursuing Bijan. A Fairfax County, Virginia police officer joined the pursuit and turned on his dashboard video camera.

5.     The footage from that camera, released in January 2018 by Fairfax County Police Chief Edwin C. Roessler ("Chief Roessler"), shows that Bijan drove at a reasonable rate of speed while being followed. He did not swerve or put anyone in danger and, despite his obvious duress, even continued to use his indicator when turning or switching lanes.

6.     Bijan stopped on three different occasions while being followed. Each time, either Amaya or Vinyard, or both, leaped from their patrol car, raced to Bijan's Jeep, and pointed a gun at his head through the driver side window.

7.     The first two times—presumably terrified of the overly aggressive officers—Bijan carefully and slowly drove away from their brandished weapons.

8.     At the third and final stop, Bijan came to a complete stop at a stop sign in the Fort Hunt area of Fairfax County, Virginia. Amaya and Vinyard then blocked Bijan's Jeep with their patrol car, and again jumped out of it to confront him with guns drawn.

9.     Amaya and Vinyard fired nine times into the Jeep, mostly from close range, as Bijan sat behind the wheel, unarmed.

10. Their bullets struck Bijan four times in the left side of his head and once in his right wrist.

11. At no time did Bijan pose a threat to anyone. Amaya and Vinyard, however, violated the Constitution and Park Police policy and training both in pursuing Bijan and in using force against him.

12. At the hospital, Bijan remained in a coma until his death. Other Park Police officers, whose identities have not been revealed to the Plaintiffs, maintained that he was "under arrest," and restricted the Ghaisar family's ability to make medical decisions on his behalf or even to touch their son.

13. After multiple doctors told the family that Bijan would never regain consciousness and would slowly die of organ failure, the Ghaisar family made the heart-wrenching decision to remove all life-sustaining equipment.

14. Bijan persevered—notwithstanding his horrific injuries—for ten days after Amaya and Vinyard shot him.

15. On November 27, 2017, Bijan Ghaisar died at Inova Fairfax Hospital at 3300 Gallows Road, Falls Church, Virginia 22042, the same hospital where he was born.

16. It has been almost 500 days since Amaya and Vinyard shot Bijan, a bright, positive, and passionate young man who believed in candor, in justice, and in peace. To date, virtually no information has been released to Bijan's family about the shooting.

17. After sixteen months, no federal, state, or local government official has explained to Bijan's family why Amaya and Vinyard frantically pursued Bijan down the George Washington Memorial Parkway and into Fairfax, Virginia after he drove away from a minor rear-end

accident—again, involving no known injuries and little property damage—in which *he* was the victim.

18. After sixteen months, no federal, state, or local government official has explained to Bijan's family why Amaya and Vinyard approached Bijan's car with weapons drawn and aimed at his head.

19. After sixteen months, no federal, state, or local government official has ever explained to the family why Bijan was "under arrest" and could not be touched in the hospital.

20. Most importantly, after sixteen months, no federal, state, or local government official has ever explained to the Ghaisar family the reasons Amaya and Vinyard fired nine times into Bijan's Jeep as he sat behind the wheel, unarmed, in the early evening of November 17, 2017.

21. Sixteen months is too long for any grieving family to live without any explanation about why law enforcement officers shot and killed their son while authorities sit on relevant information.

22. For almost sixteen months, no federal, state, or local government official would even identify the officers involved in the shooting, even though virtually every law enforcement agency now does so shortly after a shooting. However, on March 8, 2019, in response to a subpoena from the Plaintiffs in this case, the Fairfax County Police Department produced documents indicating that Defendants Alejandro Amaya and Lucas Vinyard were the two officers who shot Bijan while he sat, passive and unarmed, in his car. Counsel for the United States Park Police confirmed the identification of Amaya and Vinyard as the shooters on March 12, 2019.

23. The Ghaisar family brings this action, individually and in their official capacity as co-administrators and personal representatives of the Estate of Bijan Ghaisar, to vindicate Bijan's statutory and constitutional rights to be free from arbitrary and deadly force. They seek a

declaration that the government violated his rights. They also seek an appropriate amount of monetary damages for their harrowing and wholly unnecessary grief. The Defendants are Amaya, Vinyard, and various federal officers.

## JURISDICTION AND VENUE

24.     This action is brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), under the United States Constitution, including the Fourth Amendment to the Constitution.

25.     This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

26.     Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## JURY DEMAND

27.     Plaintiffs demand a trial by jury in this action for each of their claims triable to a jury.

## PARTIES

28.     At all times material to the events set forth in this Amended Complaint, Plaintiff JAMES GHAISAR has been a resident of the Eastern District of Virginia. He is a United States citizen currently residing in McLean, Virginia, 22102.

29.     Plaintiff James Ghaisar is Bijan's father, and is a personal representative and co-administrator of the Estate of Bijan Ghaisar. *See* Attached Exhibit A.

30.     At all times material to the events set forth in this Amended Complaint, Plaintiff KELARA "KELLY" GHAISAR has been a resident of the Eastern District of Virginia. She is a United States citizen currently residing in McLean, Virginia, 22102.

31.     Plaintiff Kelly Ghaisar is Bijan's mother and is a personal representative and co-administrator of the Estate of Bijan Ghaisar.  *See* Attached Exhibit A.

32.     According to Bijan's death certificate, he died on November 27, 2017.  The coroner listed the manner of death as "homicide."

33.     Alejandro Amaya and Lucas Vinyard are the U.S. Park Police officers who chased and shot Bijan on November 17, 2017, and who may well be responsible and liable in other ways for the acts and damages alleged in this Amended Complaint.  Alejandro Amaya and Lucas Vinyard are sued in their individual capacities.

34.     John Does 3-10 are the individuals, including Park Police officers, whose actions led to the Park Police's pursuit of Bijan's vehicle, the individuals who racially and religiously profiled Bijan, the individuals who showed deliberate indifference to Bijan's medical needs while in the hospital and who are otherwise responsible for how Bijan was treated in the hospital, the individuals who are otherwise responsible for Bijan's loss of life, and the individuals who may be responsible and liable in other ways for the acts and damages alleged in this Amended Complaint.  Because the government has refused to release any names to Plaintiffs other than Alejandro Amaya and Lucas Vinyard, Plaintiffs are unaware of the true identities of these individuals and proceed against them as John Does 3-10.

## FACTS

### A.  Bijan C. Ghaisar was a fun-loving, gun-hating, sports-crazy young man

35.     At the time he was shot and killed by the Park Police, Bijan was twenty-five years old.  He was two years out of college, worked as an accountant, and lived in an apartment in McLean, Virginia near his parents' home.

36.     Bijan's parents, James and Kelly Ghaisar, both grew up in Iran and immigrated to the United States in the 1970s.  Both became citizens of the United States.

37.     Kelly's father was the police chief in Shiraz, Iran, and a colonel in Tehran.  For this reason, Bijan grew up with deep respect for law enforcement.

38.     James and Kelly were married in 1986.  Their daughter, Negeen Ghaisar, was born in 1988, and Bijan was born in 1992.  After living in Vienna, Virginia, for several years, the family moved to McLean, where James operated his own accounting practice.  Kelly worked as a makeup artist, an interior designer, and sold real estate.

39.     Bijan was a young man of many passions, including chicken wings and video games.  Like many Americans, he also loved professional football.  Bijan was nine years old at the time of the 9/11 terrorist attacks.  After watching the New England Patriots win the Super Bowl that season, Bijan told his family that the Patriots were his favorite team for inspiring hope again in America.  Bijan named his dog Bruschi, after Patriots' linebacker Tedy Bruschi.

40.     At Langley High School, Bijan played both football and lacrosse.  Although he was not particularly big or athletic, he worked very hard for playing time.  He graduated from high school in 2010.

41.     For college, Bijan and several friends chose the University of Alabama, not far from where Bijan's father had earned his MBA with a specialization in accounting at the University of South Alabama.  But Bijan found it to be too far from home and family.  After a devastating hurricane in Alabama his freshman year, Bijan made the decision to transfer closer to home, to Virginia Commonwealth University ("VCU").

42. Bijan was beloved by his friends. Classmates and fraternity brothers from VCU describe him as a goofy and jovial friend; a real pleasure to be around. Childhood friends remember him as fun loving, comforting, and considerate.

43. Bijan graduated from VCU with an accounting degree in 2015 and began working for his father's accounting practice. He lived in an apartment in a Fairfax County high-rise.

44. Professionally, Bijan aspired to do something to make this world better. He often expressed this hope to his family.

45. Bijan hated very few things, but one thing he hated was guns. He advocated for peace and nonviolence. After the mass shooting at a movie theatre in Aurora, Colorado, in 2012, Bijan took to Facebook to say it was upsetting and unacceptable that America had not embraced gun control.

46. On the day he was shot and killed, Bijan ate lunch at his parents' house, and then took a walk with his mother. This was the last time Kelly saw Bijan.

47. That evening, Bijan had plans to have dinner with his father at 8 p.m. But, Bijan never showed up.

**B. An Uber driver rear-ends Bijan right before Park Police aggressively pursue him**

48. In the early evening of November 17, 2017, Bijan was driving on the George Washington Memorial Parkway (the "Parkway"). His vehicle was a 2013 green Jeep Grand Cherokee ("Jeep") with a vanity license plate that read "BIJAN."

49. Bijan stopped his Jeep and was struck from behind by an Uber driver in a red Toyota Corolla.

50.     According to the Department of the Interior Investigator's Traffic Crash Report, this minor traffic collision happened at about 7:31 p.m.  The rear-end collision happened on the southbound side of the Parkway just north of Alexandria, Virginia.

51.     According to this report, which is for unknown reasons dated December 1, 2017 (fourteen days after the crash date), Park Police Officer Anthony McSherry investigated the crash "at the scene," and determined the crash was not a "hit and run."  He also marked that it did not cause any "non-motor-vehicle property damage."

52.     Park Police Officer McSherry cited the Uber driver for the accident because he failed to maintain proper control, a standard charge for a rear-end collision.

53.     It appears from photos of Bijan's vehicle that his Jeep did not sustain any damage. There is no evidence that anyone was injured and, again, the Park Police report states that no one was.

54.     Bijan reportedly drove away from the scene without exchanging information with the Uber driver.

55.     Upon information and belief, the Uber driver (and perhaps also his passenger) dialed 911.  Upon information and belief, either the Uber driver or his passenger saw Bijan's license plate and reported "BIJAN" to the police.  Upon information and belief, though they were in Alexandria City, Virginia their call was routed to nearby Arlington, Virginia which most likely forwarded the call to Park Police.

**C.  Without putting anyone in danger, Bijan, who had no criminal record, was trying to get to safety and away from out-of-control officers who were chasing him**

56.     Several minutes after the traffic accident, a marked Park Police cruiser with two officers inside—Amaya and Vinyard—began following Bijan's Jeep heading south on the Parkway, which is maintained by the National Park Service.

57.     At approximately 7:37 p.m., a Fairfax County police officer joined Amaya and Vinyard's pursuit.  The video footage of the incident comes from the Fairfax County vehicle's dashboard video camera.

58.     Amaya and Vinyard did not have vehicular or body-worn cameras.

59.     The footage from the Fairfax camera shows Bijan stopped three times during the pursuit.

60.     Each time—including the very first time, with absolutely no apparent reason to be aggressive—the Park Police patrol car pulled close to the Jeep, and Amaya or Vinyard, or both, leaped from their car and ran to the Jeep brandishing weapons.

61.     Each time, Amaya or Vinyard, or both, pointed a gun toward Bijan's head.

62.     Each time, at least one of them was close enough to touch Bijan's vehicle, but neither officer was ever in the Jeep's path or in harm's way.

63.     Most likely out of mortal fear of the overly aggressive officers with their guns drawn on him, Bijan slowly drove off the first and second times that Amaya and Vinyard pulled him over.

64.     Park Police have jurisdiction over the Parkway.  Park Police policy on pursuing vehicles states that officers are authorized to pursue a vehicle only when the driver is suspected of a felony, or presents a clear and immediate threat to public safety, and also states that "[t]he act of fleeing and eluding the police shall not in itself be a pursuable offense."  General Order on Vehicular Pursuits: Number 2205, 2205.01 (B) (June 8, 2018).  During the pursuit, Bijan appeared to be driving at a reasonable rate of speed and is not observed swerving, driving erratically, or otherwise placing anyone in danger.

65. At the time he was repeatedly shot and killed by Amaya and Vinyard, Bijan had no criminal record.

**a.** ***Bijan's First Stop***

66. Much of the Parkway where Bijan drove does not have a shoulder on the side of the road for cars to pull over.

67. At 7:38 p.m., Bijan stopped in the right-lane of the Parkway, when the marked Park Police patrol car pulled alongside the Jeep, and the Park Police officers leaped from their car and ran to the Jeep.

68. Either Amaya or Vinyard approached Bijan's window with a gun pointed toward his head.

69. This same Park Police officer aggressively jerked Bijan's car door handle in an attempt to open his door.

70. Bijan slowly drove off.

71. This Park Police officer slammed his gun into Bijan's Jeep, seemingly in frustration, and dropped something to the ground.

72. The Fairfax officer pulled out to follow Bijan's Jeep, but the more aggressive Park Police car soon passed the Fairfax officer.

**b.** ***Bijan's Second Stop***

73. At 7:40 p.m., Bijan used his right-turn signal to pull off the Parkway at the West Boulevard Drive exit. Bijan again stopped in the road.

74. Amaya and Vinyard parked their patrol unit slightly in front of Bijan's Jeep and ran to his window. Again, at least one officer had his gun drawn. And, again, Bijan drove off slowly and carefully around the Park Police car, while one of the officers kicked the side of Bijan's Jeep.

11

75.     Bijan drove from West Boulevard Drive a short distance to Alexandria Avenue, then headed toward Fort Hunt Road with the Park Police and Fairfax patrol cars behind him.

### c. *Bijan's Third Stop*

76.     At 7:41 p.m., at the intersection of Fort Hunt Road and Alexandria Avenue, in a residential neighborhood in the Fort Hunt area of Virginia, Bijan stopped a third time.

77.     Bijan stopped at the stop sign, in his lane.

78.     Amaya and Vinyard pulled their patrol car in front of Bijan's Jeep.

79.     As Amaya and Vinyard rushed to Bijan's car, again with guns drawn, the Jeep appears to roll forward slightly and to the right, away from the officers on the left.

80.     The video does not show any officers in any danger of the Jeep striking them.

81.     Bijan's window remained closed.

82.     Amaya and Vinyard were within close range of Bijan as he sat unarmed behind the wheel of his Jeep, when they fired[1] nine shots into his vehicle.

83.     These shots were fired recklessly and put the Fairfax police officer, whose dashboard camera captured the shooting, in potential danger.

84.     Starting at 7:41:33 p.m., Amaya and Vinyard first fired five shots at Bijan. Then they paused.

85.     Then at 7:41:42 p.m., Amaya and Vinyard fired two more shots. Then they paused.

86.     The Jeep stopped moving entirely.

---

[1] Plaintiffs do not know, and the government has not revealed, which of the nine shots were fired by Vinyard and which were fired by Amaya. Plaintiffs therefore refer to the shots as fired by both officers.

87.     Amaya and Vinyard moved closer, and after twelve seconds, the Jeep again began rolling toward the ditch on the side of Alexandria Avenue, away from the officers.  There was no curb or sidewalk on the ditch side of the road.  It appeared as if Bijan's foot had slipped off the brake but was not on the gas pedal because the vehicle was rolling slowly toward the ditch.

88.     At 7:41:57 p.m., either Amaya or Vinyard, who had holstered his pistol, unholstered it.

89.     Amaya and Vinyard fired two more shots at close range.

90.     There was no threat to either Amaya or Vinyard or anyone else at the time of these repeated volleys of shots.

91.     No other officers at the scene fired any shots.

92.     The Jeep continued slowly toward the ditch and pitched gently to its side, contacting the stop sign, where it again stopped.

**D.  The officers who fatally shot Bijan violated the United States Constitution and Park Police policies and training in pursuing him and using force against him**

93.     In general, Amaya and Vinyard repeatedly and intentionally violated the United States Constitution as well as Park Police policies and training by their behavior following this minor traffic accident, including, but not limited to: chasing an individual; chasing a vehicle into another jurisdiction; parking their vehicle alongside a vehicle they had stopped; aggressively approaching a stopped vehicle at a run; unholstering their firearms; pointing their firearms at another person; using a firearm to strike a vehicle; kicking a vehicle; their initial use of deadly force; and their continued and repeated use of deadly force over an extended period of time with no provocation or response.

### a. *General Order on Vehicular Pursuits: Number 2205 ("Order 2205")*

94.     Order 2205 states that "[a]s soon as practical, the pursuit shall be relinquished to police units of the entered jurisdiction." 2205.04 (B)(4).

95.     The Park Police officers chasing Bijan neither relinquished nor even attempted to relinquish their pursuit to Fairfax County officers, including the one driving right behind them, even though they had left the Parkway.

96.     According to the same order, Park Police officers must notify the Communications Section that they are pursuing someone and whether the "pursuit will be entering another jurisdiction." 2205.04 (A)(9)(e).

97.     There is nothing to suggest that the Park Police officers notified anyone that they were pursuing Bijan from the Parkway into Fairfax County's jurisdiction.

98.     Order 2205 also states that a Park Police officer is "normally authorized" to pursue a person into a different jurisdiction without a warrant only if the "suspect" has "committed a felony." 2205.03 (B).

99.     Here, the accident report prepared by a Park Police officer does not cite to any property damage or injury. Again, Bijan's vehicle was the one struck in that fender bender, and it is very difficult to see how he could have committed any felony while being struck by another vehicle from behind.

100.    Consequently, Park Police officers were not authorized to chase him from the Parkway into a residential area of Fairfax County.

### b. *General Order on Use of Force: Number 3615 ("Order 3615")*

101.    Order 3615 (dated September 28, 1998) instructs Park Police officers to use "reasonable forms of verbal commands, including volume and tone control" to "avoid having to escalate to a higher level of force." 3615.03 (A).

102.    Here, Park Police officers did not use reasonable forms of verbal commands in approaching Bijan. Rather, they immediately escalated to a higher level of force in opting to park alongside Bijan and unholster their guns that they aimed toward Bijan's head and/or used to bang on his window.

103.    This order also states that deadly force is permissible "only when necessary, that is when the officer has a reasonable belief, in light of the facts and circumstances confronting the officer, that the subject of such force poses an *imminent danger of death or serious bodily harm to the officer or to another person*." 3615.03 (C)(1) (emphasis added).

104.    There is no basis to believe that the officers reasonably perceived any imminent danger "of death or serious bodily harm" to themselves or another person. In fact, by approaching Bijan as aggressively and recklessly as they did in this situation, they made clear that they did not perceive any danger of death or bodily harm. Thus, the officers' decision to aggressively pursue Bijan and use excessive force to seize him is unjustified and, more importantly, unlawful.

105.    Order 3615 clarifies that "[o]fficers shall not fire at a moving vehicle . . . except when the officer has a reasonable belief that the subject poses an *imminent danger of death or serious physical injury to the officer or to another person*." 3615.03 (C)(3)(a) (emphasis added).

106.    To the extent that Bijan's vehicle was moving at any time when the Park Police officers shot at Bijan, their actions violated Order 3615.

107.    Amaya and Vinyard jeopardized Bijan's safety and the public's safety when they fired nine shots into his car at an intersection of a residential neighborhood.

**E.  At some point after Amaya and Vinyard shot Bijan four times in the head at close range, the Park Police placed him "under arrest" for no known reason**

108.    According to Fairfax fire and rescue records, an ambulance from Alexandria arrived twelve minutes after the shooting.  The ambulance transported Bijan to Inova Fairfax Hospital ("Inova"), the same hospital where he was born.

109.    Any unnecessary delay in providing Bijan with medical assistance after he was shot constitutes deliberate indifference to his medical needs and is a deprivation of his rights in violation of the Constitution.

**a.  *Park Police representatives waited five hours before notifying the Ghaisar family that Bijan had been critically wounded***

110.    Though Bijan had identification on his person and inside his car, Park Police representatives waited about five hours before notifying James and Kelly Ghaisar about the shooting.

111.    Bijan's parents called their daughter Negeen Ghaisar, who was in Pittsburgh, Pennsylvania, to tell her that her only sibling, Bijan, was in the hospital in critical condition. Negeen Ghaisar and her husband, Kouros Emami, immediately got on a flight to Ronald Reagan Washington National Airport.

**b.  *Park Police obstructed the Ghaisar family's ability to make informed medical decisions for Bijan***

112.    Throughout the experience at the hospital, Park Police representatives alternatively referred to Bijan as a "perp" or "evidence" and told the Ghaisar family that he was "under arrest." Bijan was in a coma.

113.    The Ghaisar family, confused and distraught by these justifications, repeatedly asked the Park Police to explain why they had arrested Bijan.  They also asked Park Police to provide them with a charging document.  The Park Police refused to answer these questions.

114.    Hospital staff informed the Ghaisar family that Bijan was inoperable.

115.    Desperate to learn more about Bijan's condition and manage his medical care, Bijan's parents called a close family friend, an affiliate care provider at Inova.  They reasoned that Park Police would allow a physician who regularly treats patients at Inova to enter Bijan's room.

116.    This doctor attempted to see Bijan.  Park Police stopped the doctor from entering, forcing him to leave the ICU.  This doctor explained to the family that in all his years of practice no one had prevented him from attending to a patient.

117.    The Park Police deprived the Ghaisar family of their right to make informed medical decisions for Bijan.

118.    By prohibiting organ donation officials from seeing Bijan or discussing the matter with the Ghaisar family because Bijan was "evidence," the Park Police also interfered with Bijan's decision to donate his organs.

**c.   *Park Police continued to guard Bijan's room twenty-four hours a day and severely limit the Ghaisar family's access to him***

119.    The Park Police instructed the Ghaisar family that they could only enter Bijan's room two at a time, only at the top of the hour, and limited to ten minutes.

120.    This policy became even more absurd after Kouros Emami—Bijan's brother-in-law and a psychologist—took one of the shifts to see Bijan.  Kouros is tall, has an athletic build, and carries a thick, black beard.  After Kouros saw Bijan, the Park Police modified their own policy and said that only one person, guarded by two Park Police officers, could enter at a time.  Park Police claimed this was necessary in case they needed to restrain one of the family members.

121.    While the Park Police guarded Bijan's room for approximately three days, the Ghaisar family set alarms on their cell phones to avoid missing their ten-minute window to see Bijan.  They would nap on the hospital floor in between shifts.

122.    Once inside Bijan's room, the family's movements were closely monitored by the Park Police.  One officer explained that this was because Bijan's body was "evidence."

123.    At one point, the Ghaisar family authorized a Chaplain to pray with Bijan.  The Park Police officers guarding Bijan told the Chaplain that she could not touch Bijan because he was Muslim, and Muslims could not be touched by women.

124.    Bijan was not Muslim.

### d. Bijan dies on November 27, 2017

125.    Several doctors told the family that Bijan would not survive and that he was slowly dying of organ failure.  Based on the information provided by the doctors, the family had the hospital remove the feeding and breathing tubes from Bijan after he had survived in a coma for nine days.

126.    Bijan survived over ten hours without the respirator.

127.    Bijan was pronounced dead on November 27, 2017.

**F.  Despite pleading with the authorities for information to deal with the pain of losing their child and brother, the authorities remain silent on virtually all aspects of Bijan's killing**

128.    Sixteen months after the Park Police killed Bijan, none of the agencies who are involved—including the FBI, the Department of Justice Civil Rights Division, or the D.C. U.S. Attorney's Office—has substantively commented on the case.  They have refused to provide, and have stood in the way of others providing, the Ghaisar family with significant information in their

possession about the shooting. For example, the Ghaisar family has not been told why Bijan was pursued, or why he was placed "under arrest" at the hospital.

129. U.S. Government officials continue to stand in the way of federal and state Freedom of Information processes by preventing the Ghaisar family and members of media from receiving important information about the shooting.

130. Park Police have said that Bijan's Jeep was involved in an accident, but law enforcement refuses to release significant information about the accident.

131. Even now, sixteen months after Bijan's shooting, none of the agencies have offered even a bare-bones account to explain why Park Police officers repeatedly opened fire on Bijan, who—as a video of the incident shows—presented no threat to himself, the officers, or anyone else.

132. In fact, the Ghaisar family was only able to view the video documenting their son's killing because Chief Roessler decided to release it against the wishes of the Department of Justice.

## FIRST CLAIM FOR RELIEF

### Violation of the Fourth Amendment: Unlawful Seizure by Using Unreasonable and Excessive Deadly Force
### Against Defendants Alejandro Amaya and Lucas Vinyard

133. The foregoing allegations are re-alleged and incorporated herein by reference.

134. Defendants Alejandro Amaya and Lucas Vinyard intentionally or recklessly violated Bijan's rights, privileges, and immunities secured to him by the Fourth Amendment to the United States Constitution including the right to be free from unreasonable searches and seizures without probable cause and the right to be free of and from the use of excessive force.

135. Amaya and Vinyard personally fired nine gunshots at an unarmed driver who was—at worst—failing to comply with a police officer's commands. This was excessive and

19

unreasonable deadly force against Bijan in violation of the Fourth Amendment to the United States Constitution.

136.     In addition, Amaya and Vinyard also personally violated Bijan's rights under the Fourth Amendment to the United States Constitution by, *inter alia:*

> (a)     Unreasonably pursuing Bijan based on him being the victim of a minor car accident;
>
> (b)     Immediately and unreasonably approaching Bijan with guns pointed at his head when he pulled over;
>
> (c)     Unreasonably approaching Bijan with guns pointed at his head when Bijan pulled over a second time;
>
> (d)     Gratuitously firing nine distinct shots at Bijan, when they knew, at the time of each shot, that he did not pose a threat to them or anyone else;
>
> (e)     Gratuitously firing nine shots at Bijan when they knew or should have known that Bijan was too severely injured to be a threat to them or anyone else; and
>
> (f)     Gratuitously firing nine shots at Bijan to seize him, when they knew or should have known, that they were likely to cause severe injury or death to the unarmed driver.

137.     The unconstitutional actions alleged against Amaya and Vinyard were clearly established as unconstitutional as of the time they were taken.

138.     At the time they took all of the unconstitutional actions alleged in the foregoing paragraphs, Amaya and Vinyard were federal agents acting under color of federal law.

139. As a result of Alejandro Amaya's and Lucas Vinyard's unlawful conduct, Bijan suffered fatal injuries and monetary damages.

## SECOND CLAIM FOR RELIEF

### Against Defendants John Does 3-10

140. The foregoing allegations are re-alleged and incorporated herein by reference.

141. There was no probable cause to justify arresting and detaining Bijan, depriving him of his family's care and presence before he died, showing deliberate indifference to his medical needs, and racially and religiously profiling him. Upon information and belief, there was no probable cause to justify an aggressive pursuit of Bijan's vehicle.

142. John Does 3-10 are responsible for these unconstitutional actions.

143. The names of John Does 3-10 are unknown to Plaintiffs at this time because the government has refused to reveal the identities of any individuals, other than Amaya and Vinyard, who were involved in Bijan's chase, shooting, "arrest," treatment at the hospital, and death.

144. As a result of John Does 3-10's unlawful conduct, Bijan suffered fatal injuries and monetary damages.

## DAMAGES

145. As a result of Amaya and Vinyard's unlawful conduct, Bijan suffered fatal injuries and monetary damages. His death on November 27, 2017 injured the Ghaisar family.

146. As the surviving parents of Bijan and as personal representatives and co-administrators of the Estate of Bijan Ghaisar, the Ghaisar family seeks damages to compensate for, *inter alia*, the constitutional violations their son suffered in an amount to be shown at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, for the reasons stated above, the Ghaisar family respectfully requests that the Court enter a judgment against Defendants:

1. Awarding compensatory damages to Plaintiffs in the amount of $25,000,000;

2. Awarding compensatory and punitive damages against the individual Defendants for the constitutional violations their son suffered in an amount to be shown at trial;

3. Awarding Plaintiffs attorneys' fees and costs pursuant to federal and state laws; *and*

4. Ordering such other and further relief as the Court considers just and proper.

Dated: March 29, 2019

Respectfully submitted,

<u>/s/ Thomas G. Connolly</u>
Thomas G. Connolly (VA Bar No. 29164)
Roy L. Austin, Jr. (appearing *pro hac vice*)
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street NW, 8th Floor
Washington, D.C. 20036
Telephone: 202-730-1300
*tconnolly@hwglaw.com*
*raustin@hwglaw.com*

*Counsel for Plaintiffs*

# EXHIBIT A

 

# CERTIFICATE OF QUALIFICATION

## Circuit Court of Fairfax County, Virginia

Fiduciary Number FI-2018-0001989

I, **John T. Frey**, Clerk of the Circuit Court of Fairfax County, Virginia, the same being a Court of Probate and of Record and having a seal, do hereby certify that it appears of record in my office pursuant to law that:

James Caesar Ghaisar and Kelara K Ghaisar

duly qualified in this court as Co-Administrators for the estate of Bijan Ghaisar, deceased, **pursuant to §64.2-454 of the 1950 Code of Virginia, as amended, for the purpose of a wrongful death or personal injury suit.**

A bond in the amount of $100.00 has been posted.

The powers of the fiduciary(ies) named above continue in full force and effect.

**IN TESTIMONY WHEREOF** I have hereunto set my hand, and affixed the seal of said Court hereto, at Fairfax, Virginia this 15th day of October, 2018.

**TESTE: JOHN T. FREY, CLERK**

By: _____
                     Deputy Clerk

V I R G I N I A: IN THE CIRCUIT COURT OF FAIRFAX COUNTY

Fiduciary Number FI-2018-0001989

Estate of Bijan Ghaisar, deceased

## ORDER APPOINTING AN ADMINISTRATOR

It appearing that Bijan Ghaisar, was a Fairfax County resident and died intestate on 11/27/2017, and on his own motion, **pursuant to §64.2-454 of the 1950 Code of Virginia, as amended,** it is ORDERED that James Caesar Ghaisar and Kelara K Ghaisar are hereby appointed co-administrators of the estate of Bijan Ghaisar, deceased, **for the purpose of a wrongful death or personal injury suit.**

James Caesar Ghaisar and Kelara K Ghaisar then appeared, made oath as the law directs, and acknowledged a bond as administrator in the penalty of ONE HUNDRED dollars, without surety, waived pursuant to §64.2-505 of the 1950 Code of Virginia, as amended. This bond, being payable and conditioned according to law, and is ORDERED to be recorded.

Whereupon a list of the heirs at law of the decedent is submitted and having been sworn to, is admitted to record.

Entered this 15th day of October, 2018.

TESTE: JOHN T. FREY, CLERK

By: _____, Deputy Clerk

10/15/2018
RECORDED FAIRFAX CO VA
TESTE: _____ J. Frey
CLERK